## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Ann McKenzie, M.D.,

        File No. _____

       Plaintiff,

v.

**COMPLAINT**
**(JURY TRIAL DEMANDED)**

Mayo Clinic Health System-Lake City and
Mayo Clinic,

       Defendants.

---

Plaintiff Ann McKenzie, by her attorneys Nichols Kaster, PLLP, brings this action for damages and other legal and equitable relief, stating the following as her claims against Defendants Mayo Clinic and Mayo Foundation:

### JURISDICTION & VENUE

1.  This Court has original jurisdiction to hear this Complaint and to adjudicate the claims stated herein under 28 U.S.C. § 1331, this action being brought under the Family and Medical Leave Act ("FMLA"), § 29 U.S.C. § 2601 et seq.

2.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367 to adjudicate Plaintiff's claims under the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 et seq.

3.  The unlawful practices described hereinafter have been committed in the District of Minnesota, and the employment records relevant to those practices are

1

believed to be maintained and administered at the offices of Defendants in the District of Minnesota.

## PARTIES AND JURISDICTION

4.      Plaintiff Ann McKenzie, M.D., ("Dr. McKenzie") is a physician in good standing in the State of Minnesota, who resides in the City of Wabasha, Wabasha County, Minnesota.

5.      Defendants Mayo Clinic and Mayo Clinic Health System-Lake City (collectively, "Defendants") are both nonprofit corporations organized under the laws of the State of Minnesota.

6.      Mayo Clinic has its principal place of business at 200 First Street Southwest, Rochester, Olmsted County, Minnesota 55405.

7.      Mayo Clinic Health System-Lake City has its principal place of business at 500 West Grant Street, Lake City, Wabasha County, Minnesota 55041.

## FACTUAL BACKGROUND

8.      Dr. McKenzie joined Wabasha Clinic ("Lake City Clinic") as a Family Practice Physician on October 1, 1992 working three days per week in the clinic plus completing call, obstetrics, and other full time responsibilities.

9.      Defendants purchased Lake City Clinic in July 1993.  Dr. McKenzie continued to work for Defendants with the same duties following the purchase.

10.      On December 29, 1997, Dr. McKenzie was diagnosed with multiple sclerosis.

11.    In January 1998, Defendants began providing reasonable accommodations for Dr. McKenzie's disability, allowing her to cease night-time call duties and after-hour responsibilities.

12.    In September 1999, Dr. McKenzie reduced her scheduled appointments to three half-days per week, and began receiving disability insurance benefits due to her multiple sclerosis.

13.    Although Dr. McKenzie scheduled patients only three half-days per week, she regularly worked a full day three days per week to complete her documentation and other responsibilities, and frequently accepted unscheduled add-in appointments. As a result, she typically worked in excess of nine hour days three days per week, and completed additional responsibilities on occasion.

14.    Since March 2000, Dr. McKenzie's symptoms have remained stable, and her attendance and performance at work have remained the same.

15.    Despite her disability, Dr. McKenzie maintained a competitive productivity level and positive performance throughout her employment.

16.    In 2006, Lake City Clinic Chief Administrative Officer Cheryl Kramer ("Kramer") initiated a campaign of discriminatory harassment against Dr. McKenzie based on her disability.

17.    For example, Defendant demanded that Dr. McKenzie attend a meeting to discuss her disability, and invited two of Dr. McKenzie's colleagues, Dr. Jeremy Solberg and Dr. Tom Witt, to attend the meeting. Dr. McKenzie was not permitted to have a third party attend the meeting with her, despite Human Resources Representative Kristin

Witham's assurances to the contrary. The focus of the meeting was a barrage of slander intended to embarrass and humiliate Dr. McKenzie in front of her colleagues.

18.     The Medical Director falsely accused Dr. McKenzie of using foul language when talking to her nurse. The Medical Director persisted in pursuing discipline even when Dr. McKenzie's nurse, Lori Anderson, confirmed that this allegation was false.

19.     Defendant also began to apply a number of rules and mandates to Dr. McKenzie because of her disability, even though other physicians were not subject to the same rules.

20.     On several occasions, Defendant berated Dr. McKenzie for having a nurse that worked more than half-time, because she was receiving the reasonable accommodation of working less hours.

21.     Kramer frequently denied Dr. McKenzie large amounts of her continuing medical education ("CME") budget, and denied her routine requests for reimbursement of CME expenses.

22.     Kramer prohibited Dr. McKenzie from speaking to the Medical Director at Lake City Clinic unless Kramer gave prior authorization.

23.     Dr. McKenzie was not permitted to dispute allegations against her that the Medical Director deemed true, even if they were not true.

24.     Dr. McKenzie was prohibited from talking to anyone about these directives or her interactions with Lake City Clinic's Administration.

25.     Upon information and belief, none of Dr. McKenzie's non-disabled colleagues were subjected to the heightened rules and mandates that Kramer and Lake City Clinic Administration imposed on Dr. McKenzie.

26.     On December 28, 2006, Dr. McKenzie issued a written complaint to Mayo Health System's Division Chair for Human Resources Robert Blomberg ("Blomberg"). Dr. McKenzie's complaint described Lake City Clinic Administration's unlawful handling of her employment and disability discrimination.

27.     Within days of submitting her complaint, Lake City Clinic Administration, at Kramer's direction, threatened to issue a determination that Dr. McKenzie was 100% disabled and stop providing reasonable accommodations to her.  Dr. McKenzie was given the alternative option of issuing her resignation, and informed that if she chose to do so Kramer would waive the 60-day notice rule to ensure her prompt departure.

28.     The threat to issue a determination that Dr. McKenzie was 100% disabled was ultimately abandoned as Blomberg began his investigation of Dr. McKenzie's complaint.

29.     On April 26, 2007, Blomberg informed Dr. McKenzie that he completed his investigation. He stated that "Dr. Witt and Cheri Kramer [were] deeply embarrassed" by their conduct, but that Defendants would not provide ongoing supervision or oversight of their conduct going forward.

30.     In late 2010, Blomberg retired.

31.     Upon Blomberg's retirement, Kramer immediately resumed her previous pattern of discriminatory and retaliatory action against Dr. McKenzie by turning trivial

matters into distorted serious allegations, and regularly insisting that Dr. McKenzie violate her doctor's orders necessary to maintain her health in the face of her documented disability.

32. On January 8, 2011, the day after Dr. McKenzie's father passed away, Kramer scheduled a meeting to discuss Dr. McKenzie's disability-related illnesses and other "time off requests," which referred to her absence due to her father's illness and death.

33. On February 2, 2011, Kramer held a meeting to subject Dr. McKenzie to unreasonable complaints and scrutiny about her missed work due to her father's death and her multiple sclerosis.

34. Dr. McKenzie began to experience increased symptoms of her multiple sclerosis and anxiety related to her increasingly hostile work environment.

35. On February 5, 2011, Dr. McKenzie's multiple sclerosis and related asthma caused her to miss work due to Kramer's harassment.

36. On February 28, 2011, Dr. McKenzie wrote a second complaint to Blomberg, explaining the recent increase in harassment, and once again requested help in ameliorating Defendant's discriminatory and retaliatory behavior.

37. Dr. McKenzie specifically stated that in the recent months, Kramer had: (1) subjected her to different policies and procedures than her non-disabled colleagues; (2) used demands for documentation about her disability to harass her; (3) allotted her less CME funding than the other physicians for discriminatory and retaliatory reasons, and misappropriated even that smaller amount of funding; (4) denied her reimbursement for

legitimate professional expenses; (5) denied her vacation time proportional to the amount of work she completed and commensurate to other physicians; (6) denied her raises or bonuses; and (7) refused to allow Dr. McKenzie full access to her nurse, regularly reassigning her nurse to other tasks.

38.     Dr. McKenzie also communicated to Blomberg that she was unsure who to contact in his absence, and requested that he forward her correspondence to the appropriate parties for investigation.

39.     Shortly thereafter, Dr. Rob Nesse ("Nesse") responded to Dr. McKenzie regarding her second complaint.  Nesse stated that he forwarded the letter to Human Resources Director Tyson Stackhouse ("Stackhouse") and Chief Administrative Officer Mark Koch ("Koch").

40.     Upon realization that Dr. McKenzie submitted a second discrimination complaint, Kramer dramatically increased the level of unnecessary discipline and harassment of Dr. McKenzie.

41.     Under Kramer's supervision, Kay Kluge maliciously issued a Corrective Action against Dr. McKenzie based on fabricated and baseless allegations, as part of a continued pattern of retaliatory behavior for Dr. McKenzie's protected discrimination complaint.

42.     Not only were Dr. McKenzie's colleagues not subjected to similar baseless complaints, but Defendants treated Dr. McKenzie's non-disabled colleagues with more leniency, even when they were the subject of legitimate complaints.

43.    On June 21, 2011, Kluge and Human Resources Representative Jackie Ryan ("Ryan") demanded a meeting with Dr. McKenzie.

44.    Dr. McKenzie suggested that they meet the following day at 1:00 PM instead, so that she could complete her scheduled clinic work that day within her medical restrictions. Kluge and Ryan refused this accommodation, standing in Dr. McKenzie's office door and staring at her until she acquiesced to their short-notice demand.

45.    During the meeting, Ryan became angry at Dr. McKenzie, raising her voice to the point where the other employees outside in the hall could hear her.

46.    At one point, Ryan leapt out of her chair, charged at Dr. McKenzie, and jabbed her finger repeatedly approximately 20 inches from Dr. McKenzie's face.

47.    Ryan continued to shout, make inappropriate threats, and refused to allow Dr. McKenzie to respond to Kramer's false allegations.

48.    In October 2011, Ryan issued a second Corrective Action to Dr. McKenzie, vaguely stating that she had "spoken negatively about senior leadership to the support staff and in the presence of support staff."

49.    Dr. McKenzie requested further detail regarding the October 2011 Corrective Action, but neither Ryan nor Kramer were willing to explain what Dr. McKenzie allegedly said or identify the source of the allegations.

50.    As a result of the October 2011 Corrective Action, Ryan deducted one day of Dr. McKenzie's pay as a disciplinary measure and was suspended for one day of work.

51.    On February 7, 2012, Defendants' Claims Section Head Laura Mundt ("Mundt") emailed Dr. McKenzie, stating that "a re-evaluation with Dr. Robin Molella

8

[was] necessary to review [her] current work restrictions and make sure they are still accurate and appropriate."

52.     On February 28, 2012, Dr. McKenzie underwent psychiatric testing based on false allegations made by Defendant of "personality change and questionable cognitive functioning."

53.     Dr. McKenzie missed a day of work to comply with Defendants' improper assessment demand.

54.     Defendants not only refused to pay Dr. McKenzie for her time on the day of the mandated testing, but also failed to pay the bill for the psychiatric testing that they ordered.  Not only was Dr. McKenzie's insurance billed first, but Defendants continued to refuse to pay the remaining $860 after insurance for many months, despite Dr. McKenzie's numerous requests for payment.

55.     On March 19, 2012, Molella issued a work status report re-affirming that her "[p]ermanent restrictions limit work to half time 50% productivity based on original work schedule (3 days per week)." The report also stated that Dr. McKenzie should "work with [her] supervisor to identify reasonable accommodations for intermittent FMLA covered absences."

56.     Molella also completed FMLA paperwork for Dr. McKenzie's asthma, migraines, and multiple sclerosis.

57.     In early June 2012, Dr. McKenzie sent a third written complaint to Stackhouse explaining that she was experiencing a continued "pattern of abuse and harassment" as a result of her multiple sclerosis and disability.  Dr. McKenzie pointed out

9

that she was suffering adverse action in retaliation, requested reimbursement for the day that Ryan deducted pay as a disciplinary measure, and requested that the Defendants pay for the psychiatric testing that it demanded from Dr. McKenzie.

58.    On June 7, 2012, Kramer emailed Dr. McKenzie to inform her that she was scheduling a meeting with Ryan "to discuss [Dr. McKenzie's] long-term disability."

59.    On June 15, 2012, Kluge called Dr. McKenzie into a meeting with Kramer and Ryan.

60.    When Dr. McKenzie asked what the meeting was about, Kluge said the meeting was about her disability.

61.    In the meeting, Kramer gave Dr. McKenzie a 60 day notice of termination, which stated that her employment would be terminated on August 13, 2012.

62.    Kramer informed Dr. McKenzie that she was "eligible" for 100% disability, and that her disability would be changed to 100% so that she could no longer work.

63.    Kramer was unwilling to state a reason for the termination during the meeting.

64.    Kramer threatened immediate termination and eviction from the building if Dr. McKenzie talked to anyone about the substantive content of the termination meeting.

65.    Following the termination meeting, Dr. McKenzie emailed Stackhouse again to inform him of her discriminatory and retaliatory termination.

66.    On June 21, 2012, Dr. McKenzie filed another complaint grieving her meritless termination and improper corrective actions that had been taken against her in

the preceding months. She pointed out that her termination was in violation of the "Minnesota Human Rights Act as well as Federal disability employment law . . ."

67.     On June 28, 2012 Kramer submitted a written confirmation that because Dr. McKenzie worked part time and sometimes had unplanned absences due to multiple sclerosis, she would be terminated.

68.     Although Dr. McKenzie's medical condition, ability to work, and absences had remained stable for many years, Kramer asserted that based on Dr. McKenzie's need for FMLA and reasonable accommodations, "it is our conclusion that you are not performing the essential functions of your position despite the accommodations that have been consistently granted."

69.     When Dr. McKenzie appealed the termination decision, Defendants affirmed the termination.

70.     Following issuance of the termination decision, Defendants continued to harass and retaliate against Plaintiff.

71.     For example, on June 29, 2012, Mundt made a written threat to Dr. McKenzie, suggesting a possible "termination of disability benefits" if Dr. McKenzie did not provide a signed authorization releasing all medical information from all medical and health care providers to "Mayo Clinic or its representatives," which included Defendant's legal department.

72.     Following Plaintiff's termination, Defendant continued to untruthfully accuse Plaintiff of improper conduct.

73.     When Plaintiff attempted to return information to Defendant following her termination, Defendant demanded that she do so in a manner which would violate the Health Insurance Portability and Accountability Act, and threatened to sue Plaintiff if she did not violate the Act.

## COUNT I
## VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT
## (DISABILITY DISCRIMINATION / FAILURE TO ACCOMMODATE)

74.     By reference hereto, Plaintiff incorporates all of the above paragraphs as if fully set forth herein.

75.     At all times relevant hereto, Plaintiff was Defendants' "employee" and Defendants were Plaintiff's "employer" within the meaning of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.03.

76.     Plaintiff is a qualified "disabled person" under the MHRA, Minn. Stat. § 363A.03(12).

77.     The MHRA provides that it is an unlawful employment practice for an employer to discharge or discriminate against any individual with respect to the compensation, terms, conditions, or privileges of employment, because of such individual's disability.  Minn. Stat. § 363A.08.

78.     The MHRA also makes it an unfair employment practice for an employer "not to make reasonable accommodation to the known disability of a qualified disabled person . . . unless the employer . . . can demonstrate that the accommodation would impose an undue hardship on the business." Id.

79.     Defendants' conduct described herein violated Minn. Stat. § 363A.08.

80. Defendants' discriminatory and unlawful employment practices were intentional, deliberate, willful, and conducted in reckless disregard or and in gross indifference to Plaintiff's rights.

81. As a result of Defendants' conduct, Plaintiff has suffered loss of past and future income, mental anguish, emotional distress and other damages in an amount in excess of $75,000.00.

## COUNT II
## VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT
## (REPRISAL)

82. By reference hereto, Plaintiff incorporates all of the above paragraphs as if fully stated herein.

83. Minnesota Statute § 363A.15 makes it an unlawful for an employer "to intentionally engage in any reprisal against any person because that person opposed a practice forbidden under the [the MHRA] or has filed a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing."

84. Defendants' conduct described herein violates Minn. Stat. § 363A.15.

85. Defendants' discriminatory and unlawful employment practices were intentional, deliberate, willful, and conducted in reckless disregard or and in gross indifference to Plaintiff's rights.

86. As a result of Defendants' conduct, Plaintiff has suffered loss of past and future income, mental anguish, emotional distress and other damages in an amount in excess of $75,000.00.

<u>**COUNT III**</u>
**VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT**
**(RETALIATION AND INTERFERENCE)**

87.     By reference hereto, Plaintiff incorporates all of the above paragraphs as if fully stated herein.

88.     Plaintiff was an "eligible employee" pursuant to 29 U.S.C. § 2611(2), and Defendants were her "employer" under 29 U.S.C. § 2611 (4).

89.     The FMLA, 29 U.S.C. § 2612(a)(1)(D), provides that an employee may have up to twelve weeks of leave during any twelve month period because of a serious health condition.

90.     The FMLA provides that it is unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" any rights provided under the FMLA. 29 U.S.C. § 2615(a).

91.     The FMLA, 29 U.S.C. § 2615(a)(1)-(2) also specifically forbids an employer from retaliating against employees for exercising their right to take the statutorily protected leave.

92.     The FMLA's implementing regulations provide that "[t]he Act's prohibition against "interference" prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c).

93.     Defendant's conduct described herein was because of Plaintiff's use of FMLA leave and her request to continue using FMLA leave.

94.     Defendant's conduct described herein constitutes interference and/or

retaliation in violation of 29 U.S.C. § 2615.

95.    Defendant committed this violation willfully or with reckless or deliberate disregard for the rights and safety of Plaintiff.

96.    As a result of Defendant's conduct in direct violation of the FMLA, Plaintiff has suffered loss of past and future income and other damages in an amount in excess of $75,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ann McKenzie prays for judgment as follows:

A.    That the conduct of Defendants complained of herein be determined and adjudged to be unlawful in direct violation of the Minnesota Human Rights Act and the Family and Medical Leave Act;

B.    For an award of damages arising from past and future loss of income and benefits, emotional distress, and all other damages available under the Minnesota Human Rights Act and the Family and Medical Leave Act;

C.    For double and treble damages;

D.    For punitive damages;

E.    For civil penalties;

F.    For equitable and injunctive relief;

G.    For costs, disbursements and attorneys' fees;

H.    For all other relief available by statute and common law;

I.    For a jury trial on all issues;

J.    For such other and further relief as the Court deems just and equitable; and

K.    For leave to amend the Complaint to include claims for violations of the Americans with Disabilities Act once Plaintiff receives a right to sue letter from the Equal Employment Opportunity Commission.

Dated: \_\_\_11-1-12\_\_\_

**NICHOLS KASTER, PLLP**

Steven Andrew Smith (#260836)
      smith@nka.com
Adrianna Shannon (#0387799)
      shannon@nka.com
4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200

ATTORNEYS FOR PLAINTIFF