UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Ann McKenzie, M.D.,

Plaintiff,

v.

Mayo Clinic Health System-Lake City,
and Mayo Clinic,

Defendants.

Court File No.: 12-CV02787 (SRN/TNL)
Case Type:  Employment

**DEFENDANTS' MEMORANDUM OF
LAW IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION**

---

## INTRODUCTION

Defendants Mayo Clinic Health System—Lake City ("Mayo-LC") and Mayo Clinic (collectively referred to as "Mayo") seek injunctive relief to require Plaintiff Ann McKenzie ("McKenzie"), a former Mayo-LC physician, to return all Mayo patient information in her possession.  McKenzie admits that she possesses protected health information ("PHI") regarding Mayo's patients on her personal electronic devices, yet she has failed to return this information or submit her devices for forensic testing, despite repeated demands by Mayo.

In June 2012, Mayo-LC notified McKenzie that her employment contract was being terminated, effective August 14, 2012.  Before her termination date, Mayo conducted an audit of McKenzie's computer and discovered that McKenzie had copied PHI regarding Mayo-LC patients to her own non-Mayo electronic devices.  A subsequent forensic analysis revealed that McKenzie attempted to "cover up" this unauthorized

copying by installing software to scrub portions of her Mayo-issued computer on her termination date—all without Mayo's knowledge or authorization.

An injunction is essential to ensure patient confidentiality and protect Mayo PHI from being compromised. McKenzie's continued retention of Mayo's PHI puts Mayo (and Dr. McKenzie) at risk of violating state and federal patient privacy laws. Moreover, absent an injunction, Mayo is threatened with serious, irreparable harm to its reputation in the medical community.

## FACTUAL BACKGROUND

McKenzie entered into an employment agreement ("Agreement") with Community Clinics, a predecessor of Mayo-LC, on June 23, 1993. Declaration of Jacki Monson ("Monson Decl.") Ex. B. Mayo-LC is the successor-in-interest to Community Clinics under the Agreement and Mayo-LC was McKenzie's employer until her separation from employment. Monson Decl. ¶¶ 7, 3.

Through the Agreement, McKenzie agreed, *inter alia*, that all patient medical records are the property of her employer and that such records must be returned to and retained by the employer upon her termination. Specifically, she agreed as follows:

> Section 11. Records and Files. In the event of the termination of employment of [McKenzie], possession of each corporate record and file shall be retained by [Mayo-LC]. All individual patient medical records pertaining to individuals treated by Employee are and shall remain under the ownership and control of Employer, as the case may be, and shall be held in the strictest confidence by Employee.

Monson Decl. Ex. B (emphasis added).

In June 2012, Mayo-LC notified McKenzie that it was terminating her contract (for reasons unrelated to her unauthorized copying of Mayo PHI), and that her employment with Mayo-LC would end effective August 14, 2012.  Declaration of Jessica J. Nelson ("Nelson Decl."), Ex. 1.   At that time, Mayo-LC specifically instructed McKenzie not to take any patient information with her upon her termination.  *Id.*

A.    **Mayo Discovers That McKenzie Maintained Separate Patient Databases and Downloaded Them to External Devices Without Mayo's Authorization.**

In July of 2012, Mayo's internal investigative unit  ("Unit") employed forensic software to capture, review, and analyze the computer assigned to McKenzie. Declaration of Franklin H. Krahn ("Krahn Decl.") ¶ 4.  This investigation determined that McKenzie was maintaining independent patient databases outside of Mayo's primary electronic medical records ("EMR") system.  McKenzie was storing on personal devices approximately 4,200 patient records which equated to 426 unique patients.  Krahn Decl. ¶ 5.  In addition to storing thousands of patient records outside the Mayo EMR system, McKenzie copied patient data to a variety of external non-Mayo devices, with noted activity on June 19, July 17, July 18, July 25, and July 27, 2012.  Krahn Decl. ¶ 6.  This copying occurred *after* McKenzie was informed of her upcoming termination.  At no time did Mayo authorize this download of information.  Monson Decl. ¶ 13.

The Unit performed a subsequent analysis of McKenzie's work computer in August, 2012, and discovered that McKenzie engaged in significant deletion activity on her termination date, August 14, 2012.  She went so far as to download software called Speedy PC Pro, which is designed, in part, to remove all traces of information from an

electronic device.  Krahn Decl. ¶¶ 7–8.  In addition to deleting information, the software is used to hide activity occurring on the computer by erasing user activity.  Krahn Decl. ¶ 9.  Mayo-LC <u>never</u> authorized McKenzie to apply or download a computer program to her company-owned computer that would erase or hide any activity performed on it.  Monson Decl. ¶ 13.  McKenzie utilized Speedy PC Pro to preclude Mayo from discovering her computer activities and the disposition of the patient databases that she copied and currently retains on non-Mayo devices.  Krahn Decl. ¶¶ 9–10; Monson Decl. ¶ 11.  Dr. McKenzie has admitted possessing Mayo's PHI, but given her use of this scrubbing software, Mayo cannot ascertain the extent or scope of her unauthorized activities relating to its patient records until it has the opportunity to fully inspect all devices that contain such information.  Krahn Decl. ¶ 11.

### B.      Mayo Has A Responsibility To Maintain And Safeguard Patient Information.

As a healthcare provider, Mayo has an obligation to comply with state and federal privacy laws and regulations, and it takes very seriously its responsibility in this regard.  Monson Decl. ¶¶ 4–5.  Mayo's ability to safeguard its patient information is essential in maintaining its positive reputation in the community as a trusted provider and leader in the healthcare industry.  Monson Decl. ¶ 5.

To ensure that patient information is adequately protected, Mayo has implemented comprehensive policies and protocols to carry out its responsibilities related to the privacy of patient information, including formal training for employees regarding the appropriate use and disclosure of patient information.  Monson Decl. ¶ 6.  As a Mayo

employee with access to PHI, McKenzie was required to use, access, and handle patient information in accordance with Mayo's patient privacy policies and protocols, and the law.  Monson Decl. ¶ 4.  Consequently, she was required to attend Mayo's annual compliance training relating to the privacy of patient information.  Monson Decl. ¶ 7.

As discussed above, the employment Agreement signed by McKenzie contains additional provisions regarding the safekeeping of patient information.  Monson Decl. ¶ 7, Ex. B.  This is yet another step that Mayo takes to protect its patient information.

In addition to its policies and employee training, Mayo ensures that its electronic patient information remains confidential by utilizing highly complex computer systems that restrict access and which employ sophisticated encryption techniques when transmitting patient information.  Monson Decl. ¶ 8.  To ensure that patient information remains secure, Mayo employees are never permitted to download or transfer patient information to non-encrypted or unsecure devices such as an external flash drive or computer.  Monson Decl. ¶ 9.  At no time did Mayo authorize McKenzie to transfer or download its patient information to her own personal, external storage devices.  Monson Decl. ¶ 13.

**C.     The Patient Information Possessed By McKenzie Belongs to Mayo.**

While Mayo's patients retain a right to request access to their own medical information, Mayo maintains the ownership interest in the information and data.  Monson Decl. ¶ 10.  McKenzie was informed, and contractually agreed at the commencement of her employment, that "[a]ll individual patient medical records pertaining to individuals treated by Employee are and shall remain under the ownership and control of Employer."

Monson Decl. Ex. B.  This is also required by Mayo's Privacy Policy for Electronic

Access to Protected Health Information ("Mayo Policy"), which states:

> Mayo Clinic retains all rights to all Mayo Clinic patient PHI
> acquired during the course of their care at Mayo. PHI may not be
> permanently removed without the express written approval of the
> Legal Department, Compliance Committee and/or the Clinical
> Practice Committee as appropriate. If the information being released
> is not de-identified, an additional consent form reflecting the current
> Health Insurance Portability and Accountability Act (HIPAA)
> regulations and any other regulatory or legal standards is required.

Monson Decl. Ex. A.

None of McKenzie's patients have provided the written authorization necessary to

effect the transfer of their patient records to McKenzie; thus, all patient records remain

the property of Mayo, and McKenzie has no right to continue to possess records relating

to patients she treated at Mayo-LC.  Monson Decl. ¶ 12.  This is particularly true given

that McKenzie's employment ended some four months ago; yet, it is undisputed that she

is in possession of a significant amount of Mayo's patient information.

Mayo must have all of its patient information to assure quality of care.  Mayo's

medical records not only contain information essential for the treatment of its patients,

but they also have proprietary value because some of the treatment Mayo-LC provides is

not generally known in the healthcare industry.  Monson Decl. ¶ 10.  Mayo owns all

proprietary information relating to its care and treatment of patients, including the

opinions and impressions of its medical staff as contained in its patient records.  *Id.*  Such

information does not belong to individual Mayo employees.  Monson Decl. Ex. A.

### D.     McKenzie Has Not Returned Mayo-LC's Patient Information.

Following Mayo-LC's second forensic examination of McKenzie's computer, which revealed that she had surreptitiously copied Mayo medical records onto her own personal devices, Mayo-LC it demanded that McKenzie produce all of her electronic devices containing PHI for inspection by an independent, third-party computer forensic examiner.  *See*, *e.g.*, Nelson Decl. Ex. 1.   Counsel for the parties had subsequent communications and negotiations about the issue, culminating in Mayo-LC making a final demand for the return of its patient information through a neutral forensic examiner, imposing a deadline of November 1, 2012.  *See id.*, Ex. 3.  McKenzie did not comply with the deadline.  She instead commenced the instant lawsuit against Mayo-LC.

Even though McKenzie freely admits she is in possession of Mayo-LC's patient information *on numerous personal devices*, she has yet to provide them for inspection. Nelson Decl. Ex. 2.  McKenzie has resisted on two primary bases.  First, notwithstanding the fact that she covertly copied these records to non-Mayo equipment in violation of her Agreement and Mayo Policy, and then engaged in activity evidencing an intent to cover her tracks, McKenzie takes the position that Mayo should now trust her to delete Mayo's patient information herself and then simply provide an affidavit confirming that fact.  *Id.*

Second, McKenzie refuses to submit her devices because she and her husband, Dr. Peterson, have co-mingled Mayo-LC's patient information with:  (1) patient information

from Peterson's independent medical practice; and (2) their own, personal information.[1]

In fact, McKenzie concedes that she and her husband have allowed Mayo-LC's patient information to be placed on the same devices as their personal information and information from her husband's independent psychiatry practice. *See id.* (confirming that "the equipment at issue also includes protected health information about patients from Jonathan G. Peterson Psychiatry, Ltd. as well as confidential privileged information and private personal information about Dr. Peterson and / or Dr. McKenzie."); Plf. Answer to Counterclaim ¶ 15 ("Plaintiff admits that her husband's psychiatry practice maintains some patient information on the electronic equipment that Defendant demanded from Plaintiff.").

Notwithstanding the fact that all of these issues were directly caused by or attributable to McKenzie's own conduct, she has continued to insist upon numerous conditions with regard to the review of her electronic devices. *See* Nelson Decl. Ex. 4. She will not produce several devices that she admits have contained Mayo PHI unless all of *her* conditions are met. Nelson Decl. Ex. 2. She also refuses to allow the independent, third party forensic examiner chosen by Mayo to inspect the data, even though Mayo has been willing to allow McKenzie's requested expert to be present for the entire examination. Nelson Decl. Exs. 3, 4. Finally, despite the fact that she was the one who placed Mayo PHI on the same devices containing her husband's PHI, McKenzie insists that her counsel be allowed an unfettered inspection of all Mayo PHI recovered from the

---

[1] As discussed in more detail below, the fact that McKenzie has co-mingled Mayo-LC's patient information with other data does <u>not</u> operate as a defense for her actions.  More accurately, it establishes a possible violation of privacy laws on her part.

devices—without any safeguards to protect the privacy of Mayo's patient information. Nelson Decl. Ex. 2.  That proposal is not acceptable to Mayo for obvious reasons.

### E. Mayo's Proposed Examination Procedure Allows For the Protection Of All Parties' PHI.

In order to reach a resolution on this matter, Mayo has recently presented an alternative proposal to McKenzie for the forensic examination procedure.  Nelson Decl. Ex. 5.  Mayo has agreed to allow the forensic examination to be conducted by a mutually-agreeable independent forensic consultant ("Consultant"), but is has requested that McKenzie and Mayo split the cost of the Consultant's services.  *Id.* Cost-sharing is an important part of the proposal, for two reasons.  First, fundamental fairness requires that McKenzie bear a portion of the expenses caused by her wrongdoing.  In addition, cost-sharing ensures that the Consultant is in fact working on behalf of both parties.  *Id.*

Under this proposal, McKenzie will submit all of her personal devices that have ever contained Mayo PHI ("Primary Devices") to the Consultant for forensic examination.  *Id.*  For all devices that she claims have never held Mayo PHI ("Secondary Devices"), McKenzie will submit an affidavit attesting to that fact under oath.  *Id.*

With respect to the Primary Devices, the Consultant will prepare a forensic copy of the hard drive/memory of each device.  *Id.*  The parties will work with the Consultant to develop search criteria to identify and isolate all PHI on the Primary Devices. *Id.* The process will begin with the assumption that all PHI found on the Primary Devices belongs to Mayo, but the process will allow Peterson the opportunity to rebut that presumption upon a proper showing:

- First, Dr. Peterson will provide additional information and search criterion to the Consultant in order to identify PHI relating to Dr. Peterson's medical practice ("Peterson PHI"). *Id.*

- After the Consultant isolates the potential Peterson PHI, the parties will agree upon a process for Dr. Peterson's counsel to create a log, similar to a privilege log, identifying all data claimed to be Peterson PHI. Dr. Peterson will provide information establishing his ownership interest in and/or right to retain the information logged as Peterson PHI. *Id.*

- Mayo will then have an opportunity to review the log, and object to any information improperly logged as Peterson PHI. *Id.*

Following a successful completion of the process, the parties will provide confirmation to the Consultant that it can permanently remove all PHI from the Primary Devices and return it to Mayo, aside from the data mutually-identified as Peterson PHI. *Id.* Any Peterson PHI in dispute will not be deleted or removed unless and until the issue is resolved by the parties or the Court. *Id.*

Through this motion, and as discussed in more detail below, Mayo-LC seeks the full recovery of its patient information through an independent forensics examiner in a way that does not compromise the confidentiality of Mayo's PHI. It is undisputed that McKenzie's employment ended August 14, 2012, that she possesses a significant amount of Mayo-LC's patient data, and that some four months later, she has still not returned it. Mayo's motion should be granted in its entirety.

## LEGAL ARGUMENT

## I.   STANDARD FOR PRELIMINARY INJUNCTION.

A district court has broad discretion when ruling on requests for injunctive relief. *Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 803 (8th Cir. 2003). The court must consider four factors in determining whether a preliminary injunction should issue:  (1) the threat of irreparable harm to the movant in the absence of relief; (2) the balance between that and the harm that the relief may cause the non-moving party; (3) the likelihood of the movant's ultimate success on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).  No one factor is determinative; rather, "in each case the factors must be balanced to determine whether they tilt toward or away from granting injunctive relief."  *ATS Logistics Servs., Inc. v. Lorenzo*, 2004 WL 2944108, at *2 (D. Minn. Dec. 17, 2004).

Because a "preliminary injunction motion is too early a stage of the proceedings to woodenly assess a movant's probability of success on the merits with mathematical precision," when the balance of the other factors weighs in favor of the movant, "a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation."  *Wells Fargo Invs., LLC v. Bengtson*, 2007 WL 2007997, at *1 (D. Minn. July 9, 2007) (citing *Gen. Mills., Inc. v. Kellogg Co.*, 824 F.2d 622, 624 (8th Cir. 1987); *Dataphase Sys., Inc.*, 640 F.2d at 113).

Each of the *Dataphase* factors supports granting Mayo's motion.  The Court should therefore enjoin McKenzie's continued possession of Mayo's patient information.

## II.   MAYO WILL SUFFER IRREPARABLE HARM IF MCKENZIE CONTINUES TO RETAIN PATIENT INFORMATION.

Mayo satisfies the first *Dataphase* factor because it is threatened with significant irreparable injury in the absence of an injunction.  A party suffers irreparable harm when "the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."  *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996).

Mayo's potential harm is threefold.  First, allowing McKenzie to retain Mayo's PHI could jeopardize Mayo's compliance with the Health Insurance Portability and Accountability Act ("HIPAA"), carrying the potential for significant civil and criminal penalties.  Second, if the information is not promptly returned, Mayo faces a serious threat of irreparable damage to its reputation and good will.  Finally, without an injunction, Mayo's ability to provide treatment of its patients may be inhibited.

### A.   An Injunction Is Necessary To Allow Mayo To Comply With HIPPA.

HIPPA regulations require covered entities such as Mayo to safeguard and protect the privacy of PHI.  *See* 45 C.F.R. § 164.530(c).  Under these regulations, covered entities are required to implement policies and procedures to prevent against the impermissible access, use, and disclosure of PHI.  *See* 45 C.F.R. §§ 164.530(c)(2), 164.306(a).  This includes making sure that employees do not retain access to PHI following their termination from employment.  45 C.F.R. § 164.308(a)(3)(ii)(C).  If a covered entity learns of any potential use or disclosure of PHI that violates the entity's policies and procedures or the requirements of HIPPA, the entity must mitigate, to the

extent practicable, any harmful effect of the impermissible use or disclosure.  45 C.F.R. § 164.308(a)(6).

Given these federally-mandated obligations, it is absolutely essential that Mayo regain control of its patient's PHI as soon as possible.  McKenzie's continued retention of the PHI poses several security risks.  First, McKenzie is no longer authorized to use, access, or disclose the PHI since she is no longer an employee of Mayo-LC.  Second, McKenzie has placed Mayo's PHI on a several devices accessible to her husband, and may have even comingled the data with his practice's PHI, thus posing an additional possibility for unauthorized access.  Finally, as discussed above, Mayo has employed numerous security measures on its computer systems to protect the privacy of PHI. Monson Decl. ¶ 8.  In contrast, McKenzie's personal devices likely do not contain these safeguards, thus posing the continued risk of a privacy breach from an outside source.

Pursuant to HIPPA regulations, it is also critical that McKenzie return for forensic examination each and every one of her devices that have contained Mayo PHI at any point in the past.  Mayo has specific obligations regarding the disposition of its electronic PHI and/or the hardware on which the PHI is stored.  *See* 45 C.F.R. 164.310(d)(2)(i). Because improper disposal of PHI could result in impermissible disclosures, Mayo must ensure that the disposal method reasonably protects against threats or hazards to the security of electronic PHI.  *See* 45 C.F.R. 164.530(c)(2), 164.306(a).  To that end, Mayo must be satisfied that all electronic PHI is properly and completely removed from electronic devices before those devices are made available for re-use.  *See* 45 C.F.R. 164.310(d)(2)(i) and (ii).

Despite these clear mandates, McKenzie has specifically refused to produce multiple personal devices, which she admits have contained Mayo patient information. Nelson Decl. Ex. 2.  She will not turn over these devices on the basis that she has already "deleted" all Mayo PHI from them.   However, simply deleting electronic data is not sufficient to ensure the proper disposal of PHI.  These devices must be inspected by an accredited and neutral expert and such data must be completely overwritten or purged using specialized software or hardware.

Given the significant issues at stake for Mayo and its patients, it is not sufficient that McKenzie provide an affidavit attesting to the fact that PHI has been removed from such devices.  McKenzie's prior track record with respect to surreptitious activities calls in to question whether such statements are credible. McKenzie must submit all these devices for examination to guaranty that no PHI remains, pursuant to HIPAA regulations.

**B.**     **Absent An Injunction, Mayo Is Threatened With Loss Of Goodwill.**

In addition to possible HIPAA violations, a privacy breach caused by McKenzie would cause Mayo to sustain significant irreparable harm to its reputation and goodwill. Courts have repeatedly recognized that potential loss of goodwill qualifies as irreparable harm.  *Iowa Utils. Bd.*, 109 F.3d at 426.  *See*, *also United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) ("[l]oss of intangible assets such as reputation and goodwill can constitute irreparable injury"); *Medicine Shoppe*, 336 F.3d at 805 ("Harm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars.").

While Mayo does not believe that McKenzie's actions up to this point rise to the level of a formal "breach" under HIPAA, if McKenzie mishandles the information and causes a future breach, Mayo would be required to notify the United States Department of Health and Human Services, each individual patient affected (which could amount to over 400), as well as prominent media outlets.  42 U.S.C. § 300jj *et seq.* (2009).

Such disclosures would be devastating to Mayo's business.   Because patients rightfully expect that their medical information will remain secure and private, any mishandling of patient information would cause significant harm to Mayo's reputation among patients, prospective patients, providers, and the entire healthcare community. Monson Decl. ¶ 5.  In short, any unauthorized disclosure by McKenzie has the potential to cause devastating harm to Mayo's well-respected, world-renowned brand.

On these facts, and as a direct result of McKenzie's continued possession of Mayo's patient data, Mayo has demonstrated that it is likely to suffer irreparable harm to its goodwill without equitable relief.  *See*, e.g., *Wells Fargo Invs.*, 2007 WL 2007997, at *2–3 (granting injunctive relief, noting that the inability to safeguard confidential information can cause irreparable harm); *Prudential Ins. Co. of Am. v. Sandvold*, 2012 WL 245161, at *2–3 (D. Minn. Jan. 25, 2012) (granting injunctive relief in favor of employer where former employee's possession of proprietary information would cause employer to suffer irreparable harm to its goodwill).

### C.  The Patient Records Are Necessary For Mayo's Healthcare Operations.

Finally, Mayo must gain access to the patient information in McKenzie's possession in order to deliver care to its patients.  McKenzie's continued retention of over

4,000 patient records apart from Mayo's primary EMR system is if grave concern to Mayo.  As explained by Jacki Monson, Mayo's Chief Privacy Officer:  "Until Dr. McKenzie's personal electronic devices can be fully examined and inspected by Mayo, we cannot ascertain the full extent of what patient records were taken by her.  For example, the patient information in Dr. McKenzie's possession may be different from the data maintained in our EMR system.  That data may be important to Mayo's on-going care and treatment of patients."  Monson Decl. ¶ 13.  Thus, an injunction is necessary so that Mayo can guarantee that its patient records are complete.

## III.   THE BALANCE OF HARMS WEIGHS IN FAVOR OF GRANTING THE INJUNCTION.

Mayo satisfies the second prong of the *Dataphase* analysis because balance of harms favors the injunction.  The potential harms facing Mayo if this injunction is not granted significantly outweighs any harm to McKenzie.  McKenzie has identified two alleged "harms" associated with the return of information.  First, McKenzie claims that rather than going through the inconvenience of submitting her devices for inspection, she should instead be allowed to delete Mayo's patient information herself.  *See id.*[NKA letter dated Oct. 19].  This solution is untenable.  As discussed in section II.A. *supra*, HIPAA requires Mayo to make certain that all electronic PHI is properly disposed of before the devices can be reused.  The disposal process must be conducted by professional forensics experts; it cannot be fulfilled by allowing McKenzie to simply delete files from her computer.

Second, McKenzie refuses to submit her devices to Mayo's chosen independent expert on the grounds that *she* chose to co-mingled Mayo-LC's patient information with patient information from her husband's independent medical practice, as well as their own, personal information.   However, McKenzie fails to acknowledge that these problems were caused by her own misconduct.  The fact that Peterson mismanaged his own PHI by placing it on the same devices should not allow him (or McKenzie) to dictate and place unreasonable demands on the process used to return the information to Mayo.

It bears repeating that Mayo <u>never</u> authorized McKenzie to copy patient data onto her own personal devices, it <u>never</u> authorized her to download it to her own personal devices, and it most certainly did <u>not</u> allow McKenzie to co-mingle its patient information with other data on her computers.  McKenzie cannot be allowed to hide behind the effects of her own wrongful (and illegal) activity in order to avoid an injunction which is sought for the legitimate purpose of insuring the integrity and security of Mayo's patient information.

The balance of harms lopsidedly supports Mayo's request for an injunction.

## IV.    MAYO IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

The court must next consider the likelihood that the movant will prevail on the merits.  *S&M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992).  Mayo need only demonstrate that it is likely to succeed on one of its claims in order to satisfy this prong of *Dataphase*.  *See United Healthcare Ins. Co.*, 316 F.3d at 742–43.

**A.     Mayo Is Likely To Succeed On Its Breach Of Contract Claim.**

Pursuant to McKenzie's Agreement with Mayo-LC, all patient medical records are the property of Mayo-LC and such records are required to be retained by Mayo-LC upon her termination.  McKenzie's employment contract is unambiguous in this regard.  See Monson Decl., Ex. B ("All individual patient medical records pertaining to individuals treated by Employee <u>are and shall remain under the ownership and control of Employer</u>, as the case may be, and shall be held in the strictest confidence by Employee.") (emphasis added).

In direct contravention of her employment agreement, prior to her termination, McKenzie extracted Mayo's patient information and copied it onto to her own personal external storage devices, without authorization.  Monson Decl. ¶ 13.  She then scrubbed her computer to cover the evidence of her breach of the Agreement.[2]  Krahn Decl. ¶¶ 9–10.  In addition to violating Mayo-LC's ownership rights under the contract, McKenzie's taking of Mayo's patient information also violates the contract's provision requiring that patient records "be held in the strictest confidence."   As discussed in detail above, McKenzie's actions have put the privacy of the patient data at risk.  Because Mayo is likely to succeed in its breach of contract claim, this factor weighs in favor of Mayo.

**B.     Mayo Is Likely To Succeed On Its Misappropriation Of Trade Secrets Claim.**

Mayo is also likely to prevail on the merits because it can establish a violation by McKenzie of the Minnesota Uniform Trade Secrets Act ("MUTSA"), Minn. Stat. §

---

[2] Under these circumstances, Mayo's anticipated pursuit of a claim for spoliation will be well founded.

325C.01, *et seq*.  Under this statute, both actual *and threatened* misappropriation of trade secrets are actionable.  Minn. Stat. § 325C.02(a) (2006).  MUTSA protects against the misappropriation of data that (1) is not generally known or readily ascertainable to the public; (2) derives independent economic value from secrecy; and (3) is the subject of reasonable efforts to maintain secrecy of the information.  *Strategic Directions Grp., Inc. v. Bristol-Myers Squibb Co.*, 293 F.3d 1062, 1064–65 (8th Cir. 2002).

Courts have specifically found that patient health information can qualify as a trade secret.  *See HealthSouth Corp. v. Health Fitness Corp.*, 2002 WL 254512, at *11 (D. Minn. Feb. 13, 2002) (recognizing that medical records can constitute trade secrets if they satisfy the other requirements of MUSTA).  For example, in *Medical Wellness Assocs., P.C. v. Heithaus*, 2001 WL 1112991, at *19 (PA. C. Feb. 13, 2001), the court explained that a doctor had been employed in a position of confidence through which he had access to his employer's trade secrets.  The court identified the "trade secrets" as "including but not limited to patient lists, patient names, addresses and telephone numbers, medical records, pricing information, billing procedures, patient good will, and patient development and advertising techniques, all of which were highly confidential and valuable assets of [the employer]."  *Id.*  In addition, in *U.S. Bioservices Corp. v. Lugo*, 595 F. Supp. 2d 1189, 1195 (D. Kan. Jan. 21, 2009), the court found that "information concerning patients . . . including specifically-described reports . . . valuable to competitors" can qualify as trade secrets, thereby allowing for the claim of misappropriation of trade secrets under Kansas law.

In this case, Mayo's patient records and information qualify for trade secret protection, and McKenzie's failure to return such information constitutes a violation of the MUTSA.  As detailed in the Monson Declaration, the information contained in Mayo's medical records is not readily available to the general public or Mayo's competitors.  Monson Decl. ¶ 10.  In addition, Mayo will be able to prove at trial that its patient records derive independent economic value for these reasons.  *Id.*  Thus, Mayo is thus likely to succeed on the merits of its claim that McKenzie violated MUTSA.

## V.     THE PUBLIC INTEREST FAVORS GRANTING THE INJUNCTION.

Public interest is served through this motion.  The privacy and integrity of patient health information, as codified in HIPAA and other state and federal privacy laws, is of utmost importance.  As Monson described in her Declaration, "[p]atients should be able to expect that their medical information will remain secure and private."  Monson Decl. ¶ 5.  In addition, there is a strong public interest in upholding contractual agreements.  *See Med. Shoppe*, 336 F.3d at 805.   Safeguarding Mayo's legitimate business interests and the discouragement of unfair competition are also served by this request for injunctive relief.  *Equus Computer Sys., Inc. v. N. Computer Sys., Inc.*, 2002 WL 1634334, at *4 (D. Minn. July 22, 2001).

In contrast, the public interest is not advanced if a former employee, such as McKenzie, "is allowed to derive benefit from violating [her] employer's confidence and confidentiality after enjoying a relationship that provided [her] considerable education, training, and income over a period of years."  *World Data Prod., Inc. v. Keefe*, 1999 WL 1037992, at *4 (Minn. Ct. App. Nov. 10, 1999).  McKenzie cannot be allowed to retain

Mayo's patient information in violation of federal privacy laws to the detriment of Mayo and its patients.  Thus, an injunction favors the public interest.

## **CONCLUSION**

An injunction is necessary to prevent Mayo from sustaining irreparable harm from McKenzie's misconduct.  McKenzie's continued retention of Mayo's confidential PHI on her multiple personal electronic devices, which may be comingled with her husband's information, creates the potential for unauthorized disclosure under HIPPA.  In addition to violating the law, such potential disclosures by McKenzie could cause Mayo's reputation and its relationship with its patients to be forever and irreparably damaged.  For all the foregoing reasons, Mayo's motion should be granted in its entirety.


Dated: December 6, 2012.            FELHABER, LARSON, FENLON & VOGT, P.A.


By: s/ Jessica J. Nelson_____
       Penelope J. Phillips, #200876
       pphillips@felhaber.com
       Brian T. Benkstein, #325545
       bbenkstein@felhaber.com
       Jessica J. Nelson, #0347358
       jnelson@felhaber.com
220 South Sixth Street, Suite 2200
Minneapolis, Minnesota 55402
(612) 339-6321

ATTORNEYS FOR DEFENDANTS